CAUSE NO. 2010-21712

| | | |
|---|---|---|
| JACKIE ANDERSON, PATRICK COCKERHAM, DIANN BANKS, HERBERT LENTON, and MABLE CALEB, | § § § § § | IN THE DISTRICT COURT OF |

FILED IN
1st COURT OF APPEALS
HOUSTON, TEXAS
5/11/2015 8:16:19 PM
CHRISTOPHER A. PRINE
Clerk

*Plaintiffs*,

§ HARRIS COUNTY, TEXAS

v.

TERRY GRIER, SUPERINTENDENT
OF THE HOUSTON INDEPENDENT
SCHOOL DISTRICT,

§ 164TH JUDICIAL DISTRICT

*Defendants*.

## PLAINTIFF-APPELLANTS' REQUEST FOR COURT REPORTER'S RECORD

To: Ms. Donna King, CSR; Official Court Reporter, 164th Judicial District Court of Harris County, Texas; 201 Caroline, 12th floor; Houston, Texas 77002; Tel. No. (713) 368-6256 .

Under Texas Rule of Appellate Procedure 34.6, Plaintiff-Appellants Jackie Anderson, Patrick Cockerham, Diann Banks, Herbert Lenton, and Mable Caleb hereby request the official court reporter to supplement the record on appeal with the Reporter's Records previously prepared in this matter. The portions of the proceedings for which transcripts were previously requested and prepared to be included are as follows:

1. May 11, 2012, Oral hearing on Defendants Elizabeth Mata Kroger and Martin, Disiere, Jefferson & Wisdom, L.L.P.'s motion to dismiss Plaintiffs' second amended petition for failure to replead in compliance

with special exceptions (Reporter's Record attached as **Exhibit A**); and

2. September 30, 2011, Oral hearing on Defendants' Motion to Strike Pleading (Reporter's Record attached as **Exhibit B**).

Plaintiff-Appellants have previously made payment for the costs/fees for preparation of the court reporter's record. Under Texas Rule of Appellate Procedure 37.3, Plaintiff-Appellants accept responsibility for payment of any additional costs/fees for preparation and filing of the court reporter's record for appeal.

Date: May 11, 2015.

Respectfully Submitted,

WATTS & COMPANY LAWYERS, LTD.

/s/ *Larry Watts*
Laurence ("Larry") Watts
State Bar No. 20981000
Melissa Azadeh
State Bar No. 24064851
P.O. Box 2214
Missouri City, Texas 77459
Tel: (281) 431-1500
Fax: (877) 797-4055
Email: wattstrial@gmail.com

ATTORNEYS FOR PLAINTIFF-APPELLANTS
JACKIE ANDERSON, PATRICK COCKERHAM,
DIANN BANKS, HERBERT LENTON, AND
MABLE CALEB

**CERTIFICATE OF SERVICE**

I hereby certify that on this 11th day of May 2015, a true, complete, and correct copy of the foregoing and attached documents were served on all opposing counsel(s) of record via e-filing, e-service, if available, and/or facsimile transmission, in accordance with the rules, to:

Arturo Michel
*amichel@thompsonhorton.com*
John Hopkins
*jhopkins@thompsonhorton.com*
Thompson & Horton, LLP
3200 Southwest Freeway, Suite 2000
Houston, Texas  77027-7554

The Honorable Christopher A. Prine
Clerk of Court
First Court of Appeals
301 Fannin Street
Houston, Texas  77002-2066

/s/ *Larry Watts*
Laurence ("Larry") Watts

CAUSE NUMBER 2010-21712

JACKIE ANDERSON, PATRICK     : IN THE DISTRICT COURT
COCKERHAM, DIANN BANKS,      :
and HERBERT LENTON, et al.   :
                             :
v.                           : HARRIS COUNTY, TEXAS
                             :
TERRY GRIER, Superintendent  :
of the HOUSTON INDEPENDENT   :
SCHOOL DISTRICT; ELIZABETH   :
MATA KROGER; MARTIN,         :
DISIERE, JEFFERSON & WISDOM, :
L.L.P.; DAVID P. FRIZELL;    :
FRIZELL GROUP,               :
INTERNATIONAL, L.L.C.; and   :
ESTEBAN MAJLAT               : 164th JUDICIAL DISTRICT


*************************************************

*MAY 11, 2012*

*************************************************




        On the 11th day of May, 2012, the following proceedings came on to be heard in the above-entitled and -numbered cause before the Honorable Alexandra Smoots-Hogan, Judge Presiding, held in Houston, Harris County, Texas.

        Proceedings reported by Certified Shorthand Reporter and Machine Shorthand/Computer-Aided Transcription.

EXHIBIT A

*A P P E A R A N C E S*

*FOR THE PLAINTIFFS:*
    Mr. Laurence Watts, SBN 20981000
    WATTS & ASSOCIATES
    P.O. Box 2214
    Missouri City, Texas   77459
    Telephone: 281-408-4107
    Facsimile: 877-797-4055


*FOR THE DEFENDANTS, ELIZABETH MATA KROGER and MARTIN, DISIERE, JEFFERSON & WISDOM, L.L.P.:*
    Mr. Richard A. Morris, SBN 14497750
    Mr. Adam D. Courtin, SBN 24053153
    ROGERS, MORRIS & GROVER, L.L.P.
    5718 Westheimer Road, Suite 1200
    Houston, Texas   77057
    Telephone: 713-960-6000
    Facsimile: 713-960-6025


*FOR THE DEFENDANT, TERRY M. GRIER, SUPERINTENDENT OF THE HOUSTON INDEPENDENT SCHOOL DISTRICT:*
    Mr. John M. Hopkins, SBN 24041127
    THOMPSON & HORTON, L.L.P.
    3200 Southwest Freeway, Suite 2000
    Houston, Texas   77027
    Telephone: 713-554-6767
    Facsimile: 713-583-8884


*FOR THE DEFENDANTS, DAVID P. FRIZELL, FRIZELL GROUP INTERNATIONAL, L.L.C., and ESTEBAN MAJLAT:*
    Mr. Donald W. Crump, SBN 24069556
    HARTLINE DACUS BARGER DREYER, LLP
    3600 One Houston Center
    1221 McKinney Street
    Houston, Texas   77010
    Telephone: 713-759-1990
    Facsimile: 713-652-2419

*P R O C E E D I N G S*

THE COURT:  We are on the record in Cause Number 2010-21712, *Jackie Anderson versus Terry Grier*, and appearance for the record, Counsel.

MR. WATTS:  Larry Watts, Your Honor, for the plaintiffs.

MR. MORRIS:  Your Honor, Rick Morris for Defendant, the Martin, Disiere, Jefferson law firm and Ms. Elizabeth Mata Kroger.

MR. HOPKINS:  John Hopkins for Terry Grier.

MR. CRUMP:  Your Honor, Donald Crump for David Frizell, Frizell Group, and Esteban Majlat.

MR. COURTIN:  Adam Courtin for the law firm Martin, Disiere, Jefferson & Wisdom and Elizabeth Mata Kroger.

THE COURT:  All righty.  Y'all have been here on this before.

MR. MORRIS:  We have, Your Honor.

THE COURT:  So did we do the interrogatories that we talked about last time?

MR. WATTS:  I'm sorry, Your Honor?

THE COURT:  Last time we talked about doing five interrogatories --

MR. WATTS:  Yes.

THE COURT: Remember? -- real targeted so that we could get a sense of exactly where we're coming from.

MR. WATTS: They were pretty precise. The objections that came back were essentially that they were overbroad, that they invaded attorney/client privilege and they had invaded the -- the privilege of attorney work product.

The objection that they were overbroad I think is not well taken. I think if you read them, they're -- they're -- they're pretty precise, and especially if you look at the billing information I submitted to you that Ms. Mata Kroger and her firm had submitted to the --

THE COURT: Do you have the interrog -- does somebody have them handy?

MR. MORRIS: Your Honor, I do believe we have them.

MR. WATTS: Here, Your Honor, is a copy of the -- this is the first sup -- supplement that I filed, the second supplement, the third supplement.

THE COURT: Can you hand those to me, Mr. Morris?

MR. MORRIS: (Tendering document.)

THE COURT: Thank you.

*MR. WATTS:* And -- here. This is an affidavit that I've previously filed.

*THE COURT:* Have you set these motions to compel for a hearing?

*MR. WATTS:* I set the motion to compel for a hearing back early on --

*THE COURT:* Uh-huh.

*MR. WATTS:* -- and it was pointed out to me that I'd -- I had lapsed and not conferred for the setting of the -- the date, so -- that was the only -- main objection. In fact, counsel said when we get through with getting the dates straightened out, then we'll talk about why -- why our answers are deficient. So now we're about a month and a half, two months down the line, at a date that they -- that they -- we've all agreed upon, so we're here.

The -- the objections, Your -- not -- Your Honor, that they've made are not well taken. In fact, I think that the objections --

*THE COURT:* Oh, here we go. I'm sorry. I was looking through your motion to compel, but I'm not seeing the actual --

*MR. WATTS:* Oh, here's the motion to compel on it, Your Honor. I'm sorry.

*THE COURT:* No. No, no, no. I got

that. I -- I was looking for the actual interrogatories.

MR. WATTS: I've -- I'm going to ask, Your Honor, that -- you -- you'll notice that -- that I did not attach the interrogatories to the motion to compel. Counsel was kind enough to point that out, and he was kind enough to put the five interrogatories in. I've sort of had my plate full with some physical issues, which are going to -- thank God. -- be resolved on the 22nd of May, when I'm told that I'll be, thereafter, good as new.

THE COURT: Okay. Well, good.

MR. WATTS: Thank you, Your Honor. So the -- and this is the first time I've ever argued from a wheelchair, so -- the -- the point is that they say "We had attorney/client privilege." Well, that's not what -- they -- they tell you that.

THE COURT: Uh-huh.

MR. WATTS: But -- but they -- they don't tell the public that, and they don't tell the Commissioner of Education that, and they don't tell each other that, and -- and -- and they, in fact, are -- are -- I've -- I've shown you -- I've attached the exhibits that point out that they say that they were investigators. In fact, they don't even charge

as attorneys. They're charging $220 an hour to make the $250,000 investigation. There -- they charged $220 an hour as investigators. They didn't even put on there for attorneys' fees.

They say that -- well -- and besides that, they didn't -- they didn't think about 193.3. They never have raised that issue.

Then on the attorneys' work product -- they can't do that because there was no litigation anticipated. There were -- this wasn't done in anticipation of litigation, so those are bad-faith objections. All I want to do -- they say, "Well, she's interviewed -- she interviewed in the process." Okay. Got to back up just a minute.

*THE COURT:* Well, hold on. Let's back -- let's back up even more than that, because the motion to compel isn't set for today, right?

*MR. WATTS:* No. It was set for today.

*THE COURT:* The only thing I have is a motion to dismiss. That's all --

*MR. WATTS:* No. Well, Your Honor, I sent a setting in for a motion -- we -- we put it on the calendar.

*THE COURT:* On my calendar?

*MR. WATTS:* Yes, ma'am. And we sent a

setting in --

THE COURT: Is there a setting?

THE CLERK: No. The only thing I have is a motion to -- there was a setting from last week.

THE COURT: For last -- that's right. Oh --

MR. WATTS: And we pass -- we passed -- we passed it. We -- we -- we moved it a week because --

THE COURT: You talked to somebody and told them you were moving --

MR. WATTS: Yes.

THE COURT: -- it a week?

MR. WATTS: Yes. Yes, Your Honor. We called --

THE COURT: Did you tell the other side?

MR. WATTS: Yes. We agreed. The other side and I agreed. Everything was to be set this week.

MR. MORRIS: We did agree to move it to this date, Your Honor; but consistently we have had problems being served with notices of resetting.

THE COURT: Uh-huh.

MR. MORRIS: So I don't know that any

notice of resetting was actually sent to ensure that it was on your calendar. I know that we filed a notice to set --

MR. WATTS: And we filed a motion --

MR. MORRIS: -- a motion --

MR. WATTS: -- to set --

MR. MORRIS: -- to re-urge dismissal to today, realizing that we were agreeable to having a hearing on this date, but we -- I don't believe we ever received service of the motion to compel being set on this date.

THE COURT: Okay.

MR. WATTS: Well, it was faxed over. It's --

THE COURT: Hmm.

MR. MORRIS: Your Honor, we only learned of the original motion to compel -- and the reason it was set on the 13th is because we had not been served with notice of the hearing on the 13th, and only through affirmatively looking on PACER or electronically, we learned about that hearing and contacted Mr. Walls -- Mr. Watts --

MR. WATTS: Watts.

MR. MORRIS: -- informing that I was not available on that date and had not received

proper notice. That's what necessitated trying to reschedule the motion to rehear -- or to hear the motion to compel in the first instance --

THE COURT: Okay.

MR. WATTS: Well --

MR. MORRIS: -- because we're not getting properly served --

MR. WATTS: Well --

MR. MORRIS: -- with filings in this case.

MR. WATTS: First of all, let's go back a little bit. There have been some instances recently when you may not have been properly served, Mr. Morris. I don't think you've had that experience with me. I know Mr. -- Mr. Hopkins has, and he and I, I think, have straightened that out. A lot of that has been caused by -- by my focus on other things, perhaps, or lapse.

But I do know, Your Honor, that -- that when I originally filed the motion to compel -- the motion to compel was filed a matter of days before I was -- before I was in the hospital on a problem, and I was -- I may have missed it. They called me, and -- Mr. -- Mr. Courtin calls and says that, you know, "You didn't serve us. We didn't confer." We

communicate. I said, "Okay. We'll -- we'll take care of that."

We had another conversation. I've recited that. They gave me some dates that they wanted to have the motion to compel heard on. Fine. I did it. Then last week -- I was notified on May 2nd that my -- my hip was gone and that I'm going to have to have emergency surgery. I can't walk.

So then I asked -- I called him back. -- "Can we do this -- instead of this Friday, can we do it next Friday?" "Yes."

Mr. Gonzalez here is my assistant. Mr. Gonzalez called down here. We got the -- the setting. I was listening. We then did the notice of setting and did a FREEfax filing on that. Unfortunately, I don't have that here with me, but --

THE COURT: Okay.

MR. WATTS: I'm -- I'm --

THE COURT: All right. Well -- so I haven't looked at any of the motion to compel stuff because I didn't think it was set for today. So -- hmm. Doesn't make a whole lot of sense to me to be ruling on the motion to dismiss prior to ruling on the motion to compel, provided there -- I mean, I don't know if there is some issue. Have you all had

a conversation about --

MR. WATTS: We have.

THE COURT: -- motion to compel?

MR. WATTS: We had -- Mr. -- Mr. Morris and I had a -- the whole -- yes, and they don't intend to -- to give me an answer.

They keep saying, "Well, you don't have a lawsuit. You -- you -- your -- your questions aren't what Judge Smoots-Hogan wanted you to ask. She wanted you to ask one question, and that is, 'Did you enter into an agreement to violate the Constitution of the United States or the State of Texas?'" or something, and -- and --

THE COURT: I asked you to do that?

MR. WATTS: That's what Mr. Morris has -- has indicated to me, and that's what Mr. -- if you look, by the way, in their -- in their documents, you'll see that they have said as much. That's what he told me on May 3rd.

THE COURT: Yeah. Wait. Stop. I'm asking you because those are not words that generally come out of my mouth.

MR. WATTS: No. I agree.

THE COURT: I mean --

MR. WATTS: I totally agree, and I --

I --

THE COURT: I -- I -- stop. I sort of have an MO about those sort of things, and I'm not one to be, like, "Yeah. I'm going to need you to talk about the Constitution of the United States." I mean, that kind of stuff doesn't come out of my mouth, so I'm trying to figure out exactly what it is that we were supposed to be asking and supposed to be answering. So hold on a second. Let's see what Mr. Morris has to say.

MR. MORRIS: Your Honor, we actually have a transcript that's filed with our pleadings --

THE COURT: Uh-huh.

MR. MORRIS: -- of the hearing in which you directed Mr. Watts that he would have an opportunity to ask five interrogatories that were supposed to specifically address the special exceptions that have been the subject of two prior hearings. So by way of history, because this really is not as complicated as it seems, we filed special exceptions to the original petition in this matter.

The Court granted all nine special exception -- exceptions -- sustained them -- excuse me. -- and then asked Mr. Watts to re-plead to cure the special exceptions.

*THE COURT:* Okay.

*MR. MORRIS:* He filed an amended petition. It did not in any way address the special exceptions. We set a hearing for a motion to dismiss --

*THE COURT:* Uh-huh.

*MR. MORRIS:* -- for failure to comply with the special exceptions and a motion to strike. We had that hearing. It -- it was clear during the course of the hearing, which is all reflected in a transcript that you have before you in the pleadings, that the central issue was whether or not our client, Ms. Mata Kroger, who had been hired to conduct an investigation, conspired with Mr. Grier to retaliate against Mable Caleb and other of the plaintiffs --

*THE COURT:* I remember this. Yeah.

*MR. MORRIS:* -- for this pointed exercise of free-speech rights.

*MR. WATTS:* Or --

*MR. MORRIS:* Now, Mr. Watts -- in the course of that, this Court -- and it's in the transcript. -- very specifically questioned Mr. Watts to direct you where in his amended petition he had set forth the special facts that would support the existence of a conspiracy because the basis of the

sustained special exception was it's not good enough to simply say there was a conspiracy. You have to give facts regarding an agreement between parties to commit an unlawful act or to commit a lawful act by unlawful means.

*THE COURT:* Uh-huh.

*MR. MORRIS:* Mr. Watts couldn't do that -- again, that's reflected in the transcript. -- but then told this Court that he had cross-examined Ms. Kroger in the course of a non-renewal hearing of his client, Anderson, and that he learned in the course of that cross-examination that there was evidence to support that allegation of conspiracy.

Well, Your Honor, that's the first time I heard that -- heard that, and post the hearing we endeavored to go find that transcript, and it's just not true. It's just facially not true, what you were told was the basis of the conspiracy -- groundless conspiracy allegation that's kept this litigation alive against Ms. Kroger, who was simply hired to do an independent investigation of some alleged wrongdoing at HISD.

Nevertheless, the Court, in the course of the hearing, having heard that there might be a basis for the conspiracy allegation, told Mr. Watts

he was going to get five interrogatories, no more than five, and gave him very specific instruction that they were to be directed at the special exceptions problems that were the basis of the motion to dismiss and warned him that "You're only going to get one shot at this. They should not be objectionable. They should be tailored to address these issues." Okay? And again, I'm -- that -- that's a paraphrasing of what I believe is accurately set forth in the transcript. If I'm wrong about it, the Court can certainly see for itself what the tenor of the discussion was.

So, Your Honor, we get the five interrogatories. One of the interrogatories calls for a "Yes" or "No" answer. We answer "Yes." It's clearly responsive. That's Number 2, Your Honor. The -- the writ -- 4 and 5 have direct responses.

What we're really fighting about is interrogatories Number 1 and Number 3 that are the classic *Martin versus Loftin* fishing expeditions that ask --

MR. WATTS: Wrong.

MR. MORRIS: -- that ask --

Excuse me, Mr. Watts.

MR. WATTS: You're excused.

*MR. MORRIS:* -- ask to "Please identify every date, every occurrence, every event regarding Ms. Kroger's contacts with any district representatives." Your Honor, the problem with that is -- is there are 50, plus, people that she spoke with in the course of an investigation.

Mr. Watts is in possession, like the public is, of an investigative report that's about the size of a phone book.

*THE COURT:* Uh-huh.

*MR. MORRIS:* That's not the proper -- that's not the type of interrogatory that the Court suggested would address the special exceptions, nor is it the type of permissible interrogatory that the Supreme Court tells us is -- is allowed under the rules because it would've required us to go on in single space for 15 pages to detail all those events.

But he very specifically represented to you that there was an agreement reached between Ms. Kroger and Ms. Grier *[sic]*.

So Mr. Watts files a motion to compel. It doesn't speak to the specifics of any interrogatory. It just says the responses are in bad faith and they're incomplete. He doesn't attach the motion -- the interrogatories or the answers to his

original motion.  He does not confer regarding the substance of the motion at the time he files his motion to compel.  It was not just a failing in conferring regarding the date for setting the hearing.  He has to have a certificate of conference regarding the merits of the discovery dispute before he files that.  He did not do that.  I did see Mr. Watts long after he filed his motion to compel in a hearing at HISD where I initiated the discussion with him about the substance of the problems.

*THE COURT:*  Okay.

*MR. MORRIS:*  If he had asked, very appropriately and simply, "Identify all discussions that Kroger had with Terry Grier," which was what -- he told you was where the conspiracy was formed --

*THE COURT:*  Uh-huh.

*MR. MORRIS:*  -- "the dates, the times, the substance of those discussions," we would've responded to those interrogatories.  They would've been sworn to.  But what Mr. Watts told me -- and not only told me, but he set it forth in his own pleadings -- he said he would not expect it to yield a profitable answer, so that's why he didn't ask it.

*MR. WATTS:*  Not what I said.

*MR. MORRIS:*  It's verbatim.  I'm

reading --

MR. WATTS: No, no. You're reading the profitable answer, but you're not reading the entire statement, like -- like you've been skewing what -- what has happened in your statement, Counsel.

MR. MORRIS: So what he's essentially arguing to the Court is he didn't ask the relevant questions because he believed that Ms. Kroger would say, "No. We didn't have any agreement to go after Mable Caleb." Well, Your Honor, he has to take the evidence as he gets it. If, in fact, that's the answer, a sworn-to answer by a member of the bar, then, as this Court pointed out in -- at the time that you had argument with him about the interrogatories -- if that's the answer, he doesn't have evidence to support the conspiracy claims, and the conspiracy claims should, appropriately, go away.

What I find most telling about this whole case is that the lawsuit was initially filed against HISD. Okay? My clients didn't get added to the case until far further down the road, despite the purported evidence that Mr. Watts had of a conspiracy existing between HISD and my clients.

Your Honor, he could've taken Terry Grier's deposition. "Mr. Grier, please tell me.

What discussions did you have with Ms. Kroger?" He could've tried to garner some evidence against proper defendants in the case before filing a baseless and groundless allegation against my client, who was simply hired to conduct an investigation.

This is not the first time that Mr. Watts has sued an HISD investigator, only to end up being -- to dismiss the investigator down the road. Sued Rusty Hardin. My firm represented Mr. Hardin, only to end up dismissing Mr. Hardin from the case. He sued Mr. Richard Hightower in connection with an investigation that he did for Houston Community College, only to end up dismissing Mr. Hightower in the case.

This is a tool of harassment. Another piece of evidence that it's a tool of harassment that has gone on far too long is that when we submitted the motion to re-urge the dismissal on -- to dismiss the case for failure to plead in compliance with the special exceptions, Mr. Watts contacted my office and said, "I've had some health problems. I need an extension." We granted him the extension of time to file a response, but the very day that the motion was supposed to be submitted, which was the Monday after the Friday he called seeking the extension, what we

found out is that he had been spending considerable time preparing a new lawsuit regarding the same transactions and occurrences as the basis of the lawsuit in the current court, except he filed it in federal court and added Mable Caleb, one of the actors -- central actors to this play, as a plaintiff in that case. Your Honor, we initially came before you in August of last year, I believe --

THE COURT: Uh-huh.

MR. MORRIS: -- filing the special exceptions. We got rulings regarding the sustained special exceptions, I believe, in May. This has been an awful lot of unnecessary and unfair expense to my clients, who did nothing more than get hired to do an investigation and then got sued. And what those interrogatories reveal to me, one and three --

THE COURT: Uh-huh.

MR. MORRIS: -- is that he's trying to backfill with facts to support conspiracy allegations, facts that he didn't have when he originally filed the lawsuit against Ms. Kroger and her law firm. And so I understand he's got a motion to compel. The Court can certainly address that at the appropriate point in time, but we're simply urging at the earliest possibility that the baseless

claims that are brought against our clients be dismissed from this lawsuit.

MR. WATTS: Your Honor, may I respond?

THE COURT: Yes.

MR. WATTS: First of all, I want to talk about just some -- some of the -- he's told you that his client was hired to investigate. He said that several times, four, I think, that I counted. That's not what he told you in the objections.

In the objections he told you his client was hired as an attorney, that the function was an attorney/client relationship. That's not true. He knows it's not true because now I provided him with the documents that -- that I have that shows that -- that that's -- that's -- that's false.

The second thing he says is that I make it a pattern and practice, bad-faith harassment. I've sued Rusty Hardin in the Cuadra case because he -- this -- this is a -- Cuadra was a template developed by Mr. -- Mr. Morris's firm and -- and, frankly, Mr. -- Mr. Hopkins' firm.

THE COURT: Okay. Stop. I really don't have time to go into the minutiae --

MR. WATTS: Okay.

THE COURT: -- of whatever other

claims. I'm trying to figure out what we can do productive today.

MR. WATTS: Well, what we can --

THE COURT: What I would like you to respond to is why the first question is, frankly, the most open-ended question there was, because I remember. You told me that there was some hearing where -- there was some communication that happened where there was a conspiracy agreement made.

This question does not address the hearing or what we talked about before.

MR. WATTS: I think it -- I think, Your Honor, if you'll look at the question -- first of all, let me -- let me start off by saying counsel -- counsel slides on -- on -- on what has happened.

When I took -- in the Anderson -- in the An -- in the -- in the -- in the Jackie Anderson termination hearing, I -- Ms. Merri Schneider-Vogel presented Mata Kroger as a witness. In the process of that, I asked her -- and now I had -- I had -- had heard about the billing. The billing for Mata Kroger and Martin Disiere had not been completed yet, or I didn't have access to it. I was going to get access, and that's why I waited to file -- to join them in this lawsuit, to make sure that I had done a

reasonable investigation.

But in that hearing, in that examination I did of Ms. Kroger, I asked her, "When did you first get involved in this," words to that effect. She said that she was called by Merri Schneider-Vogel to go meet with -- with Elneita Hutchins Taylor, general counsel, at the school district, and she went down and met with her.

Well, if you look at the billing, which I now have and which I've attached and given to you, that doesn't meet anywhere. That doesn't even -- that doesn't -- it's not reflected. She -- she bills for everything. I mean, there's $140,000 worth of billing in that package alone, and there's another 110,000 in another package, but she doesn't -- doesn't show in her billing that meeting.

The second thing that I knew: I knew that when the -- Majlat, Kroger and Frizell started interviewing my clients, it was said by Mr. Majlat that they had been meeting regularly or had been meeting with the superintendent. That's Grier. In fact, he said "the new superintendent."

Now, that happened in January of 2010. He said that they had been meeting with him and that the new superintendent said that he wanted to clean

the house, and she -- that's what they told Jackie Anderson, and -- and -- and they even told Jackie An -- the new superintendent wanted to clean the house --

THE COURT: Get to the --

MR. WATTS: -- fire everybody at Key.

THE COURT: Get to the part where there is a conspiracy --

MR. WATTS: That's the --

THE COURT: -- between --

MR. WATTS: Okay. But, Your Honor, if they had been having meetings --

THE COURT: Uh-huh.

MR. WATTS: If they had been having meetings with Grier and Grier was telling his investigators that he wanted to clean house at Key -- that, Your Honor, is the core of -- of -- I think, of -- of an agreement that was there. I don't have --

THE COURT: But that doesn't show that there was a meeting of the minds between Ms. Kroger or any of the other people. I mean, some of the stuff I read yesterday when I was going through this -- you've named other lawyers at the Disiere firm as well.

MR. WATTS: There's one other lawyer, Jacks -- well, he -- if you look in there, he's the one --

THE COURT: I looked in there. You --

MR. WATTS: He's the signatory on the --

THE COURT: Stop. Stop. We had this problem last time, where you like to talk when I'm talking.

MR. WATTS: I'm just trying to --

THE COURT: No, no. Stop. Okay? We had this before. I'm not going to go through that again. Okay? I'm really not going to have that today. So what I'm trying to tell you is: You got bigger issues than you're realizing.

Your five interrogatories, frankly, just don't -- this interrogatory doesn't cut it. It just doesn't cut it. It doesn't get to the meat of it. Everything you've just told me -- maybe Mr. Grier --

Sorry, Mr. Hopkins.

But maybe Mr. Grier's got some issues, but that doesn't mean that the Disiere firm, Ms. Kroger, Ms. Gomez -- Perez Gomez, whatever -- doesn't mean that any of them made an agreement with

Mr. Grier. That's what I'm asking you. That's what I thought this interrogatory was going to say -- was -- was "Please list out the gist of every single conversation between you, Ms. Kroger, and Mr. Grier or Ms. Gomez and Mr. Grier."

MR. WATTS: Well, I'm trying to get there, Your Honor, and I -- and I ask -- if you look, it's not over. First of all, by the way, *Loftin* doesn't say. *Loftin* deals with requests for production. It doesn't deal with interrogatories, so counsel -- counsel's off base on that.

THE COURT: Get -- get to it.

MR. WATTS: But secondly -- but secondly, Your Honor, in -- in -- in the -- in -- in the -- in the first interrogatory, what I've asked her to do is to tell me -- I -- I've -- I -- I had, at that time, the -- and -- and was -- and pretty much still have it, I guess. -- the -- the billing information. "Tell me who you talked to, and tell me when you talked to them." She's -- she's put down in her billing information, which I think was crafted for the public and not crafted for fact -- but she's put down in her billing information on a quarter-hour basis what she's doing and who she's doing it with.

All I want me -- all I want to do is --

like in the *Black Lake* oil case, I want to see the backup.  I want to see the notes.  I want to know who she --

THE COURT:  Stop.  Let me try this one more time.  Did you ever ask about the communications between Ms. Kroger and Mr. Grier or Ms. Perez Gomez and Mr. Grier?  Did you ask about that?  No.

MR. WATTS:  I think I did.

THE COURT:  No.  This interrogatory --

MR. WATTS:  I think --

THE COURT:  Stop.  This interrogatory says "Tell me every conversation you've ever had with anybody."  "Anybody."

MR. WATTS:  I want to know who she interviewed, and -- and -- and -- and I want to know who she talked to, and if -- and if Majlat is telling me the truth -- or if he's telling my clients the truth when he's telling them under threatening circumstances that "We've been" -- that "You might as well give us the answer.  We've been told by the new -- the new superintendent, in meetings with them, to clean the house out there" -- that means they were meeting with Grier.

THE COURT:  But -- stop.  Being told "I want to clean the house" -- maybe Grier's got some

agenda, but being told "I want to clean the house" does not tell me there's an agreement unless the very next statement from Ms. Kroger or Ms. Perez Gomez is "You're right, Terry.  I will work with you to clean the house at Key."  Is there such a statement?  Does that exist?

MR. WATTS:  Your Honor, with -- with -- I don't know if there's such a statement.  They won't ask -- answer because they've -- they've objected on phony -- on phony objection.

THE COURT:  You didn't ask the question.

MR. WATTS:  I did.

THE COURT:  I gave you a chance --

MR. WATTS:  Well -- well, I -- I --

THE COURT:  -- to ask the question.  Stop.  I gave you a chance to ask the question.  You didn't ask the question.  I can't help you try this case.  It's not my job to prosecute this case.  I gave you a chance to ask.

I remember.  At the last hearing I told you, "I'm giving you a gift that I'm giving you a chance to ask the very question that they probably don't want to answer, but I'm giving you a chance to ask it."  I gave it to you.  You didn't ask the

question, so we don't have the answer.

Here's what I'm going to do. At this point I'm going to dismiss the conspiracy claims against the Disiere firm and Ms. Mata Kroger because as we sit here today, there is nothing in front of me that makes any kind of conspiracy claim against them. As we sit here today.

If -- months from now and you talk to Mr. Grier and Mr. Grier says, "You know what? I did. I sat down with Ms. Kroger," then I am happy to hear a motion for rehearing or an amended pleading at that time, but until there's some evidence of that, not going to happen. So give me an order because I'm dismissing these conspiracy claims.

MR. WATTS: May I have my stuff back, Your Honor, please?

THE COURT: Yes. Here's this.

Can you give this back to him? What is this?

MR. MORRIS: Your Honor, the special exceptions and motion to re-urge also extended beyond just the conspiracy allegation. It's just that the conspiracy allegation became the primary focus because that's the only response that was really made on that issue.

THE COURT: I remember that. The claims against the Disiere firm and Ms. Mata Kroger are out.

MR. WATTS: For what purpose? In all capacity? For all reasons?

THE COURT: All capacities, all reasons, they're out. If you get some evidence later on that makes it prudent to bring them back in, happy to hear that, but --

MR. WATTS: Your Honor, if I -- if I --

THE COURT: -- we haven't done anything now.

MR. WATTS: I'm going to make a motion to sever the rest of the case from -- from this action. Will -- will there -- is -- should I set that for a hearing, or should I just send it down to you?

THE COURT: Set it for hearing if you want me to hear something. Happy to hear that, but you need to set it for a hearing.

MR. WATTS: You understood? I never did sue Ms. Mike Gomez. I never sued her. She's not a defendant.

THE COURT: Okay. But you named her in --

MR. WATTS:  No.  I didn't name her.

THE COURT:  So --

MR. WATTS:  I named -- I named Mata Kroger.

THE COURT:  Okay.

MR. WATTS:  She -- Mat -- Ms. Mike Gomez is a -- is a witness because she's Ms. Mata Kroger's assistant.

THE COURT:  Uh-huh.  She's named in these pleadings that are on file --

MR. WATTS:  That's right.

THE COURT:  -- because I read her name.

MR. WATTS:  Well -- well -- that's right, but that doesn't -- un -- unfortunately, if -- if she --

THE COURT:  It doesn't matter.  I've made my ruling.  You're excused.

(End of proceedings.)

THE STATE OF TEXAS          )
                            )
COUNTY OF HARRIS            )


          I, Donna King, Official Court Reporter in and for the 164th Judicial District Court of Harris County, Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record in the above-styled and -numbered cause, all of which occurred in open court or in chambers and were reported by me.

          I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, admitted by the respective parties.

          I further certify that the total cost for the preparation of this Reporter's Record is $_____ and was paid/will be paid by _____.

          WITNESS MY OFFICIAL HAND this, the _____ day of _____, 2012.


                         _____
                         DONNA KING, Texas CSR 6273
                         Expiration Date: 12/31/12
                         Official Court Reporter
                         164th Judicial District Court
                         Harris County, Texas
                         201 Caroline, 12th Floor
                         Houston, Texas  77002
                         (713) 368-6256

CAUSE NUMBER 2010-21712

JACKIE ANDERSON, PATRICK     : IN THE DISTRICT COURT
COCKERHAM, DIANN BANKS,       :
and HERBERT LENTON, et al.    :
                              :
v.                            : HARRIS COUNTY, TEXAS
                              :
TERRY GRIER, Superintendent   :
of the HOUSTON INDEPENDENT    :
SCHOOL DISTRICT; ELIZABETH    :
MATA KROGER; MARTIN,          :
DISIERE, JEFFERSON & WISDOM,  :
L.L.P.; DAVID P. FRIZELL;     :
FRIZELL GROUP,                :
INTERNATIONAL, L.L.C.; and    :
ESTEBAN MAJLAT                : 164th JUDICIAL DISTRICT

*************************************************

*SEPTEMBER 30, 2011*

*************************************************

On the 30th day of September, 2011, the following proceedings came on to be heard in the above-entitled and -numbered cause before the Honorable Alexandra Smoots-Hogan, Judge Presiding, held in Houston, Harris County, Texas.

Proceedings reported by Certified Shorthand Reporter and Machine Shorthand/Computer-Aided Transcription.

**EXHIBIT B**

*A P P E A R A N C E S*

*FOR THE PLAINTIFFS:*
        Mr. Laurence Watts, SBN 20981000
        Ms. Susan Soto, SBN 24076707
        WATTS & ASSOCIATES
        P.O. Box 2214
        Missouri City, Texas   77459
        Telephone: 281-408-4107
        Facsimile: 877-797-4055


*FOR THE DEFENDANTS, ELIZABETH MATA KROGER and*
*MARTIN, DISIERE, JEFFERSON & WISDOM, L.L.P.:*
        Mr. Richard A. Morris, SBN 14497750
        ROGERS, MORRIS & GROVER, L.L.P.
        5718 Westheimer Road, Suite 1200
        Houston, Texas   77057
        Telephone: 713-960-6000
        Facsimile: 713-960-6025


*FOR THE DEFENDANT, TERRY M. GRIER, SUPERINTENDENT*
*OF THE HOUSTON INDEPENDENT SCHOOL DISTRICT:*
        Mr. John M. Hopkins, SBN 24041127
        THOMPSON & HORTON, L.L.P.
        3200 Southwest Freeway, Suite 2000
        Houston, Texas   77027
        Telephone: 713-554-6767
        Facsimile: 713-583-8884


*FOR THE DEFENDANTS, DAVID P. FRIZELL, FRIZELL*
*GROUP INTERNATIONAL, L.L.C., and ESTEBAN MAJLAT:*
        Mr. James M. Corbett, SBN 00783875
        BARKER LYMAN, P.C.
        3600 One Houston Center
        1221 McKinney Street
        Houston, Texas   77010
        Telephone: 713-759-1990
        Facsimile: 713-652-2419

*P R O C E E D I N G S*

*THE COURT:* All right. We are on the record in Cause Number 2010-21712, *Jackie Anderson versus Terry Grier.* If I could have appearance for the record, Counsel.

*MR. WATTS:* Larry Watts for Jackie Anderson, Patrick Cockerham, Herbert Lenton. We had filed a motion to sever. We're going to file a motion for non-suit this morning on Gloria Nash, intervenor. We've settled that case with the school district, and we're going to -- we filed a motion to sever Karen Cotton because it was more primarily related to the core issues through the Nash matter.

*THE COURT:* Okay.

*MR. WATTS:* So it's going to leave Anderson, Cockerham, Lenton --

*THE COURT:* Uh-huh. Got it.

*MR. WATTS:* -- and Banks. Excuse me.

*THE COURT:* Okay. Your introduction.

*MR. MORRIS:* Your Honor, my name is Rick Morris. I'm here on behalf of Elizabeth Mata Kroger --

*THE COURT:* Okay.

*MR. MORRIS:* -- and the Martin, Disiere, Jefferson, and Wisdom law firm.

MR. HOPKINS: John Hopkins for Terry Grier.

MR. CORBETT: Jim Corbett for Defendants Frizell -- Frizell Group, David Frizell, and Esteban Majlat.

THE COURT: All right. Okay. So, sounds like you've reached some sort of meeting of the minds with respect to Karen Cotton, so we don't need to --

MR. WATTS: Well --

THE COURT: -- talk about that.

MR. WATTS: -- Gloria Nash.

THE COURT: I thought you said Gloria Nash and --

MR. WATTS: No, no. What we're doing on Gloria Nash --

THE COURT: Uh-huh.

MR. WATTS: We have reached a meeting of the minds on Gloria Nash. We're waiting for the final papers and funding on that.

THE COURT: Okay.

MR. WATTS: The Karen Cotton matter is being severed because her link to the core issues of this case was through the -- more -- more -- more akin to Gloria Nash. So since it's -- since Nash is

out, I think that it makes more sense to sever.

THE COURT: Wouldn't it make more sense for me just to grant the motion to strike the petition intervention, you file a separate lawsuit as to Karen Cotton? Because that's what I was going to tell you to do before you started talking.

MR. WATTS: Well, I would -- I would -- I would think that it would make more -- more -- more sense to sever, but, Judge, I don't -- whatever seems more sensible to you is what's going to be more sensible in the case, I suspect.

THE COURT: Yeah. I mean, it makes more sense to me. It's procedural and, frankly, a logistical and administrative nightmare to sever cases as it is, and it's just going to make it sticky as we go forward trying to say "Are we on the 'A' case, the main case" and all the rest of it. It's better just to be a separate case.

MR. WATTS: All right, Your Honor.

THE COURT: So I'm going to grant the motion to strike the petition intervention, not that you can't re-file it at the --

MR. WATTS: As to Cotton.

THE COURT: As to Cotton. All right. That's one down. Now, let's see. We've also got --

what's the rest that we have today?  The -- the --

MR. WATTS:  The rest of it, I think, Your Honor, is the -- the -- Mata Kroger, Martin Disiere --

THE COURT:  Yes.

MR. WATTS:  -- have a complaint about whether or not I've satisfied -- I think they've -- they originally had nine special exceptions, which you granted.

THE COURT:  Uh-huh.

MR. WATTS:  I think they're now complaining about four special exceptions.

Is that --

MS. SOTO:  Five.

MR. WATTS:  Five special exceptions.

THE COURT:  Well, let's hear from them and see what they say.

MR. MORRIS:  Your Honor, we are here on a motion to strike in follow-up to special exceptions that were previously sustained by the Court.

THE COURT:  Uh-huh.

MR. MORRIS:  Before I turn to that, I do want to at least comment on the successive interventions that were filed in this Court, although I recognize the Court has addressed those.  One has

been mooted. The Court's going to dismiss the other.

My client, who's really trapped in what was originally a dispute between the plaintiffs and HISD, has had to expend time and money opposing two interventions, two completely unrelated matters in this lawsuit, and what was most remarkable about the recently filed motion to sever on -- on behalf of Cotton is the grounds asserted in the motion to sever allege that it's got nothing to do with the facts or allegations in the underlying lawsuit, which was the same basis for which we filed the motion to strike.

I -- I simply want to be on record that I think it's an abuse of process to file repeated and successive interventions in this underlying matter that opposing counsel knows to be unrelated and would ask that, hopefully, we avoid having future interventions and that this lawsuit does not become the dumping ground for every dispute that some HISD employee has with its employer because my clients, the Martin Disiere Jefferson law firm, shouldn't bear the burden of being involved in that satellite litigation. It should be filed in separate lawsuits and assigned to the appropriate court pursuant to the rules of procedure.

MR. WATTS: May I respond?

*THE COURT:* Sure, although I've already ruled --

*MR. WATTS:* Okay.

*THE COURT:* -- so this is all just --

*MR. WATTS:* All right.

*THE COURT:* -- you all --

*MR. WATTS:* Well, that -- then --

*THE COURT:* -- talking, but go ahead.

*MR. WATTS:* No, no.  I -- all I'm saying -- when the -- there is -- the -- the -- the central part of this lawsuit is that when Terry Grier became superintendent, he had -- he developed an agenda, and part of the agenda was to -- to take out Mabel Caleb and other leaders of that particular community, which included Gloria Nash.

It happened that a part of the -- the -- his process was to inter -- interject into the operations of the district a pattern and practice of using -- of using people within the district to -- to strike out at -- at people that he didn't want. Karen Cotton was one of those victims.

Now, Karen Cotton -- we never complained in her lawsuit -- in her intervention that she had an issue with -- with Mr. Morris's clients. Mr. Morris read that.  He -- he -- he had to supply

that information from his own mind, not from the pleading by Karen Cotton. The -- that's the reason.

When -- when Gloria Nash, who was the -- the nexus between the -- the core lawsuit and Karen Cotton, was no longer going to be part of this lawsuit, then the pattern and practice that had linked Karen Cotton to the core issue of the lawsuit, the Grier part of the lawsuit, was -- was no longer -- made -- made no -- made no sense, so -- to me, so I took her out. That -- that's the whole -- that was the whole deal.

THE COURT: Okay. Well, I mean, it's still the same thing I already said. It needs to be --

MR. WATTS: Oh.

THE COURT: -- separate.

MR. WATTS: Thank you.

THE COURT: I -- I -- I didn't really --

MR. WATTS: And we'll re-file.

THE COURT: -- need any more --

MR. WATTS: Okay.

THE COURT: -- rhetoric about it. I've already taken care of it. So --

MR. WATTS: All right.

*THE COURT:* What's next?

*MR. MORRIS:* All right, Your Honor. Let me move on to the motion to strike. This Court has sustained some special exceptions to Plaintiffs' pleadings on two separate occasions, one time prior to the time that the Martin Disiere Jefferson Wisdom defendants were added in the case. That was in January of last year. And then again in May of last year, you sustained a second set of special exceptions that were filed on behalf of my client.

So Plaintiff has had two opportunities to re-plead in this case. The principal challenge to Plaintiffs' pleadings was that they're asserting allegations of conspiracy. And you may remember, Your Honor, that when you sustained special exceptions, a particular concern were that the allegations of conspiracy were addressing fellow members of the bar, and the Court, at the urging of counsel, warned opposing counsel that those types of allegations should not be taken lightly and that there should be compliance with the rules requirements that there be good-faith investigation.

I can tell you and I think I'll be able to demonstrate to you why there has not been good-faith investigation and why the special

exceptions in that matter have not been met.

But let me say this that will make this much easier. It's undisputed, in review of the two sets of pleadings that have been filed in this case by Plaintiffs' counsel, that my clients did only a couple of things. They, as attorney-investigators, investigated allegations of employee misconduct for a client, for HISD, and then they provided the client a confidential investigative report, as any lawyer who conducts an investigation would provide to their client. That's it.

There's no allegation that my clients were involved in any recommendation with respect to any employment actions taken against any of the plaintiffs, nor were my clients consultant -- consulted or involved in the decision of HISD to publish the attorney/client report or confidential report that was provided by the Disiere firm to HISD.

THE COURT: Okay. So the long and the short of this is they did the report, but it's not like they sat in Terry Grier's office and said "Go and fire this person"?

MR. MORRIS: That's absolutely right. Nor did they tell --

THE COURT: Okay.

*MR. MORRIS:* -- him "Release the report" --

*THE COURT:* I realize you completely disagree, but I'm trying to short-circuit and summarize what's coming out of his mouth. Okay? That's going to be your position. Got it. Yes.

*MR. MORRIS:* Your Honor, I think what's telling is -- is if my clients were really involved in a conspiracy of which opposing counsel had good-faith belief, then they would've been included in the original filing of this lawsuit.

What I strongly suspect happened is once the original filing was made and Plaintiffs were confronted with the variety of governmental immunity defenses that were asserted in the first round of special exceptions, they realized they needed to find a new target and added the Disiere defendants to the lawsuit. They could have, much like you just heard in your prior hearing, taken depositions in the case --

*THE COURT:* Uh-huh.

*MR. MORRIS:* -- to find out if there was any evidence to support any allegation of any conspiracy, which, of course, requires specific intent and agreement to engage in an unlawful act by

lawful means or to engage in a lawful act by unlawful means, and that's what's missing from the allegations in this case. Despite this Court's admonitions, I think what best reveals the fact that they don't have the evidence to support the allegations and that these allegations have not -- brought in good faith are their own wordings when they assert the claims against the Disiere defendants.

They say Mata Kroger, MDJW, Frizell, FGI, and Majlat personally assisted Grier in a substantial way and/or -- and/or encouraged him in a substantial way and/or conspired with Grier to accomplish his tortuous goals.

Mr. Watts, just a few minutes ago, outlined for you his belief that Mr. Grier has a scheme where he's trying to retaliate against Mabel Caleb or his supporters. But what's conspicuously absent from any pleading that's been filed in this case is any allegation that any of my clients were even aware of Mr. Grier's designs or schemes, much less that they had any intent to do anything unlawful to accomplish those schemes or any allegations that there was any agreement -- any date/time/place discussion wherein they all agreed that they were going to try to accomplish something in retaliation

by virtue of my clients conducting their investigation. In the absence of those allegations, there's no sufficient allegation of conspiracy sufficient to hold my clients in the case.

Opposing counsel also doesn't address the clear legal impediment to their claims. It's the Intracorporate Conspiracy Doctrine. Your Honor, that doctrine says an agent can't conspire with its master unless that agent is acting outside the course and scope of its duties.

Here, their own pleadings and their own separate allegations of negligent investigation make it clear that my clients only engaged in actions that were in the course and scope of their employment.

For that reason, they can't, as a matter of law, have conspired with any of the HISD --

THE COURT: Well, let me ask you this question. Why haven't we had depositions in this case so far?

MR. MORRIS: Well, Your Honor --

MR. WATTS: Special exceptions.

MR. MORRIS: Frankly, I'm trying to avoid subjecting my client to the cost. They can be there as witnesses.

THE COURT: I realize that you're

trying to do that, but -- but here's the -- here's the point. And you're -- not that you're not making a good point, but all he has to do is take one deposition, and all of these special exceptions would go away. We might still deal with it at summary judgment level, but on summary judgment pra -- or special exceptions practice we could do away with it with a little bit of discovery.

MR. MORRIS: Well, Your Honor, we could.

THE COURT: Uh-huh.

MR. MORRIS: That is a practical consideration --

THE COURT: Uh-huh.

MR. MORRIS: -- that I understand could moot some of these issues, but before we get there, my clients have an entitlement to require that they plead a viable cause of action. And -- and I want -- I want the Court to understand. This is not Mr. Watts's first rodeo in suing attorney-investigators in connection with allegations made against governmental entities. My firm --

MR. WATTS: It's my second rodeo.

MR. MORRIS: Third, actually.

My firm defended Rusty Hardin, who

served --

MR. WATTS: Third rodeo.

MR. MORRIS: -- as attorney-investigator against HISD, only to have those claims against him dismissed.

MR. WATTS: When he admitted -- when he admitted that --

THE COURT: Okay.

MR. WATTS: -- HISD --

THE COURT: Okay. Okay. Stop.

MR. WATTS: -- kept information --

THE COURT: Stop.

MR. WATTS: -- from him.

THE COURT: Stop. Stop, stop, stop.

MR. MORRIS: Second.

THE COURT: We're not going to go there this morning. All right, guys? Number one, I really don't like it when people talk over me. That generally makes me angry. It's not good for me to get angry for anyone here. Okay?

So, the other thing you should know is I don't know how many rodeos you two have had before, but this is your first one with me. Let's make it a pleasant adventure during this rodeo. Okay?

Now, having accepted all of those

little warnings, let's get to the issue at hand. Okay? I understand you have some issues with the way that he's pled. He's got a hundred-page petition at this point, which, I mean, I will confess, I have tried to get through, but, as you know, I have a giant docket. I have some people waiting to talk to me for a good long hour at 10:00 o'clock today about one motion. So you understand where I'm going with this? Can we short-circuit all this?

Show me the passage, if you will, in the petition that you think does not give you enough to just get us over the special-exception hurdle.

I'm not going to discuss the merits of any claim at all. Okay? Whether or not he ultimately will have the proof of this -- that's for summary judgment time. Okay? I want to see if we have enough in this hundred pages to even get us down the road because if we don't have enough in this hundred pages to get us down the road, then you'll be right and it'll be time to get rid of this claim. So, point me to the little passage that --

*MR. MORRIS:* Your Honor, I can't because it's the converse. It's the absence of adequate pleading of a viable claim that brings me here before you today.

*THE COURT:* Okay.

*MR. MORRIS:* And -- and I -- I would say this, though. Under the Intercorporate Conspiracy Doctrine *[sic]*, the affirmative allegations that they were clearly engaging in course and scope of their employment, were hired by HISD as counsel -- that prohibits those claims against my clients. All the other claims stem from the -- the conspiracy claims. For instance, he's got Constitutional claims. My clients are gover -- are private actors. They can't be held responsible for violations of the Texas Constitution except and unless they engage in a conspiracy.

So if the conspiracy allegations fall away as a matter of law, then essentially their entire case against us falls away as a matter of law.

They also assert a negligent investigation claim. The Texas Supreme Court has already rejected the notion of a Texas -- of a negligent investigation claim in the *Sears* case, Your Honor*, Texas Farm Bureau Mutual versus Sears*, Texas 2002 case. There's no privity of relationship, of course, between my clients, as attorney-investigators, with his client. The Supreme Court made that clear in *Barcelo versus Elliott*, Texas,

nineteen -- Texas Supreme Court case, again 1996.

With respect to the Intercorporate Conspiracy Doctrine, our 14th Court of Appeals, in *Atlantic Richfield Co. versus Misty*, made that clear. And, Your Honor, I point out to you it's well established -- and, actually, I have had many rodeos with Mr. Watts on this very point. -- that where you fail to plead in accordance with special exceptions, the proper remedy for the Court is to dismiss the claim.

*MR. WATTS:* We've had no rodeos on that, Counsel.

*MR. MORRIS:* Well, there's --

*THE COURT:* Okay.

*MR. MORRIS:* -- an appellate decision --

*THE COURT:* You two have --

*MR. MORRIS:* -- in the Corpus Court of -- Christi Court of Appeals on --

*THE COURT:* -- this discussion without me.

*MR. WATTS:* Well, you'll have to show it to me, Counsel.

*MR. MORRIS:* I will.

*THE COURT:* I'm about to walk out of

the room because I'm not sure you heard me before.

MR. WATTS: I'm sorry, Your Honor.

THE COURT: Enough. We get it. You two don't like each other. I really don't, frankly, care. All I'm trying to do is get you an answer so that you can get about your business for the rest of your day. All right?

MR. WATTS: Yes.

THE COURT: So --

MR. MORRIS: Just --

THE COURT: Are you finished?

MR. MORRIS: Just so the record's clear, I'm actually very fond of Mr. Watts.

THE COURT: Okay. Well, good. You all have that kumbaya later.

Mr. Watts, your response.

MR. WATTS: Yes, Your Honor. First of all, on the -- let's take -- there were nine special exceptions. There are now four that they're -- five that they complain of. The five that they complain of are, number one, the -- they say I failed to plead intent to conspire on the civil conspiracy.

In -- in the requirements, all I have to do is plead that there was a meeting of the minds. Just by way of example, if counsel will turn to the

pleading, which is erroneously marked "99 of 212," and it's actually Page 88 -- what I state in the pleading there -- this is by way of example. In Paragraph 3: "Grier and MSB recruited the MDJW defendants to force Plaintiffs to bear false witness against Caleb, and when they wouldn't, Defendants accused Plaintiffs of being obstructive and bearing false witness to protect Caleb and Adebayo."

4.4: "Grier was joined and/or assisted by the MDJW defendants in his plan to force Plaintiffs to testify falsely. When Plaintiffs wouldn't testify falsely, the MDJW defendants joined Grier to retaliate against Plaintiffs by fraudu -- fraudulently inducing Plaintiffs to engage in interviews in which Defendants would then claim Plaintiffs had withheld information or told untruths to protect Caleb." It goes on.

If you would look then, next, to the next page, which is erroneously marked nine-something of 212 -- it's eighty -- it's the 89th page, actually, but it's the one following the one that I just had. At the top, which would be the continuing of Paragraph 4, "Plaintiff Mata Kroger, MD -- Mata Kroger, MDJW, Frizell, FGI, and Majlat personally assisted Grier in a substantial way and/or encouraged

him in a substantial way and/or conspired with Grier to accomplish his tortuous goals, and each breached a legal duty owed to Plaintiffs." Let me stop before I go further, Your Honor.

MR. MORRIS: Counsel --

THE COURT: Whoa, whoa, whoa, whoa. Stop. Actually, you just said something that was very telling. They -- that the law firm defendants breached a duty owed to Plaintiffs. That's the allegation? That's one of the allegations?

MR. WATTS: Yes, Your Honor. They breached a duty that they owed to the plaintiffs.

THE COURT: Why did they owe a duty to Plaintiffs? Did Plaintiffs --

MR. WATTS: Well --

THE COURT: -- hire them?

MR. WATTS: First of all, you owe a -- they owed a duty not to misrepresent or not to intimidate or not to coerce or not to threaten. Let me --

THE COURT: That's a stretch.

MR. WATTS: I'm stopping -- I'm stopping a little early, but let me -- let me -- let me -- let me come back, and I'm going to make -- I want to talk about that duty. That was down the

line. But counsel says that it's obvious that I didn't do an investigation because I didn't have his clients in the lawsuit from the very beginning. This lawsuit was filed in March 2010.

THE COURT: Yeah. Here -- before you waste time talking about that, I'm not swayed by that argument.

MR. WATTS: Okay.

THE COURT: So go to your next one.

MR. WATTS: All right.

THE COURT: How about we just go back to that duty question that I just asked you?

MR. WATTS: All right. Well, let's -- let's -- well, the duty -- I have evidence, Your Honor, that -- that as a result -- and I cross-examined, in one of the hearings, Ms. Mata Kroger.

THE COURT: Uh-huh.

MR. WATTS: Ms. Mata Kroger, when -- I have evidence that she was contacted initially through another outside counsel and that she was told that -- that Grier wanted the firm, as selected by this outside counsel, to -- to build a case against Mabel Caleb, that -- Mata Kroger then admitted in her testimony that she met with Merri Schneider-Vogel of

Bracewell Giuliani --

*THE COURT:* Uh-huh.

*MR. WATTS:* -- at the time, and -- may have been Bracewell -- may have been Thompson. Same group.

*THE COURT:* Uh-huh.

*MR. WATTS:* -- she met with them and -- and Elneita Hutchins-Taylor, general counsel, at their office and got her march -- marching orders.

She knew what -- the -- the deal was to -- to -- to -- to -- to basically discredit Mabel Caleb and then to try to build the evidence against her. That's why she had Patrick Cockerham, and that's why she had Jackie Anderson, and that's why she tried to -- to get -- and Herbert Lenton. That's why they tri -- she and Frizell and Majlat and a couple of others -- one other that I can think of right now, Ms. Paris from her firm, tried to get my clients to -- to tell falsehoods about Mabel Caleb.

The duty that is owed to my clients? They owed the duty to tell -- they owed the duty -- as third-party beneficiaries, they owed the duty to my client not to try to force my client into lying. My clients, on behalf of themselves or anybody else -- my clients have, under *West Virginia versus*

*Barnett* -- since 1943 it's a Supreme-Court-recognized right to silence.  They have a right not to speak out.  But --

THE COURT:  Yeah.  That doesn't establish a duty.  You got issues there.  That doesn't --

MR. WATTS:  Well --

THE COURT:  -- establish a duty.

MR. WATTS:  Okay.  Okay.  On the negligence issue, negli -- if the -- the -- there is not a -- a -- everything in this lawsuit is essentially intentional or -- or -- or gro -- or callus disregard.

THE COURT:  Okay.

MR. WATTS:  Everything --

THE COURT:  Have you -- stop.  Have you alleged -- because -- I -- I mean, show me in this hundred-and-whatever pages where we are alleging that Mata Kroger intended to get fraudulent testimony out of these --

MR. WATTS:  Paragraph 7 on -- on Page -- actually, Page 89 of the complaint. "Mata Kroger, acting for herself and for MDJW, Frizell, acting for himself and FGI, and Majlat, acting for himself, Frizell, and FGI, intentionally

constructed and/or misconstructed -- misconstrued facts and linked them with inflammatory statements and false conclusions and implications to tortuously interfere with the employment and/or business and/or careers of Plaintiffs', and in instances where Plaintiffs are certified by the state of Texas, used their influence to assist Grier to cause the TEA division of educator certification to harass and threaten Anderson and attempt to stigmatize, without legal basis, the educator certificates not only of Caleb, but also Anderson." That's still going on.

THE COURT: Stop. Stop. You're suing Mata Kroger for her opinion, how she interpreted whatever she was told by these people?

MR. WATTS: No. She was there. She was -- it was -- it wasn't that -- what she was told. She was present when -- and -- and -- and if -- and if not present, her -- her -- these were her agents, and they were present. She --

THE COURT: Right. But stop. Listen to my question, because what you just read to me -- all right? -- which --

MR. WATTS: That's only one part.

THE COURT: Stop. What you just read to me -- which, let's just go on record now. I'm not

a giant fan of being read to, which is why I always ask people just -- just to hand it to me, and I can read it myself. But what you just read to me was that she misconstrued fact and that she did so in an intentionally fraudulent way. Right? By its very definition, misconstruing facts is her interpretation of what she heard from these people, right?

MR. WATTS: Well, that's not what I meant to say. What I meant to say is that she got an apple and -- and told the -- and -- and said that she received an orange. What she --

THE COURT: Now, that -- that's in -- that's intentional. That would be a lie.

MR. WATTS: That's a lie.

THE COURT: If that's what you're saying --

MR. WATTS: I said "lie" before and got in trouble with counsel, and I don't want to say --

THE COURT: Well -- because if you're going to say that she's lying and you're saying that an officer of the court is lying, then -- you then have a duty not only to sue her in this context, but take her up to the State Bar to the grievance committee behind --

MR. WATTS: Well --

THE COURT: -- stuff like that.

MR. WATTS: -- I'm not sure I have that right, but I think that I have the right to prove whether or not that's a fact.

The -- you know, the fact that counsel -- the -- the -- the foun -- the fact that Ms. Mata Kroger -- by the way, on -- on -- let me just say that in the Hardin matter -- I just put that to rest. In the --

THE COURT: I have already forgotten it.

MR. WATTS: Okay. Ms. Mata Kroger, by being a member of the bar, is -- is -- is not immune from responsibility to the truth and integrity. Ms. Mata Kroger was placed in the position she was placed in where her firm was able to pick up a half a million dollars for doing this investigation.

THE COURT: Okay. I don't -- I don't need any of that stuff.

MR. WATTS: Well, I -- but I -- that's part of --

THE COURT: I'm trying to get to where in here it tells me that you allege that she intended to, for lack of a better word, lie --

MR. WATTS: Okay. Well, I --

THE COURT: -- because so far --

MR. WATTS: -- said that -- I said that -- I said that several times throughout here, but let me -- let me go through, and I'll -- I'll point -- by the way, on the -- the intracorporate -- can I touch that while I'm on it briefly, the intracorporate conspiracy?

That was created by the Fifth Circuit in 1952 in *Nelson Radio versus Motorola*. That's an antitrust case. It doesn't apply to civil rights cases. It -- it doesn't apply to civil rights cases for the very clear reason that it -- it -- that it is a -- a -- an attempt to re-visit a post-reconstruction attitude, and it's -- it's law that really just doesn't apply. The -- and I think -- I think probably one of the greatest examples or dissertations on that is by Horowitz at Northwestern Law Review, but the point is that -- that -- what I do say about Mata Kroger --

THE COURT: Uh-huh.

MR. WATTS: All right?

THE COURT: And -- and -- you know what? Before we go even one step further, have we had any written discovery to Ms. Mata Kroger, any interrogatories?

MR. WATTS: Haven't done anything, and I'm ready -- I'd like to do that, but I -- I understand that -- I -- I know that were I to send discovery out --

John, did I send you discovery in --

MR. HOPKINS: We've exchanged written discovery.

MR. WATTS: We have exchanged written discovery, but not with Mata Kroger.

MR. HOPKINS: I'm wait -- waiting on -- I'm waiting on answers.

MR. WATTS: Yeah. But not with Mata Kroger.

THE COURT: Mr. Morris, is -- is he about to say that if he had sent you interrogatories, you would've objected to answering them in light of the special exceptions?

MR. MORRIS: I honestly don't know, Your Honor. I probably would have given the state of these pleadings and the fact that there's no viable claims asserted. I probably would've done that.

It -- it -- I -- I say it with some degree of speculation because I think it would've depended on the nature of the discovery and how difficult it would've been to respond. So I -- I

don't know without having seen it, but I will confess to the Court, given my belief that there clearly is no viable claim asserted against my clients, I probably would've opposed it.

THE COURT: Uh-huh.

MR. WATTS: Your Honor --

THE COURT: I am tempted -- because, frankly, I would just like to put this issue to bed, and I'm not sure that doing what you wish me to do at this time would actually fully and completely put this issue to bed. I almost think it's better served to do a little written discovery, which is not a great expense. Yeah, I'm sure a depo probably would because he'd try and go on for hours, and then you'll have to come down here and complain about it or you have to call in the middle of it about objections and all that good stuff.

I almost think these issues could really be taken care of with a couple of carefully worded interrogatories to Mr. -- to Ms. Mata Kroger.

That might answer all of this, because -- for example, if it's a flat-out question of: Did you, you know, have some private meeting with so-and-so and intend to misrepresent the facts that you were given --

MR. WATTS: She'll probably say --

THE COURT: And if she says "No," then this goes away because you have nothing. That's the whole point.

MR. WATTS: That's not entirely true, Your Honor.

THE COURT: That's whole point. I'm trying to end this once and for all for everybody at the least expense. I mean, continually --

MR. WATTS: Well, can I at least take --

THE COURT: -- coming down here --

MR. WATTS: Can I take some depositions?

THE COURT: -- to hear -- I'm sorry. Was I talking? Was I talking? I know I've gone over this a couple of times. I really know I've gone over this a couple of times. Usually when I'm opening my mouth and sound comes out -- that means I'm talking.

And if you would stop and actually listen to the thoughts that are coming out of my mouth, you would realize that I was actually giving you a break. But you're so busy interrupting me instead of listening to where I was going that it creates problems for your own argument. Maybe if I

speak louder, you will understand that I am talking, therefore, you should not be. Understand?

MR. WATTS: Understood.

THE COURT: As I was saying, my inclination and what I'm going to do at this point, since my 9:00 o'clock docket is now over -- I'm going to table this issue. I'm not going to rule on it.

What I am going to instruct you to do, Mr. Watts, is to send five interrogatories. They must be carefully worded. You get one shot at it. If you don't word them right and he comes back with valid objections, then you got a big problem. Understand?

MR. WATTS: (Indicating.)

THE COURT: No. I'm not done yet.

You're going to answer those five questions in a shortened time frame so that we can get rid of this whole matter. You got two weeks -- two weeks. -- to answer those when you get them.

You have one week to craft -- one week to design five interrogatories that will deal with the issues that we keep on seeing on these special exceptions.

You got two weeks to answer them. Period, the end.

Then we will come down here and have a productive conversation, where I'm sure Mr. Watts will have learned not to talk over me.  Understand?

*MR. MORRIS:*  Yes, Your Honor.

*THE COURT:*  That's what we're doing. This hearing is over.  Good day.

*(End of proceedings.)*

THE STATE OF TEXAS      )
                        )
COUNTY OF HARRIS        )


          I, Donna King, Official Court Reporter in and for the 164th Judicial District Court of Harris County, Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record in the above-styled and -numbered cause, all of which occurred in open court or in chambers and were reported by me.

          I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, admitted by the respective parties.

          I further certify that the total cost for the preparation of this Reporter's Record is $_____ and was paid/will be paid by _____.

          WITNESS MY OFFICIAL HAND this, the _____ day of _____, 2011.


                         _____
                         DONNA KING, Texas CSR 6273
                         Expiration Date: 12/31/12
                         Official Court Reporter
                         164th Judicial District Court
                         Harris County, Texas
                         201 Caroline, 12th Floor
                         Houston, Texas  77002
                         (713) 368-6256